## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| BOY SCOUTS OF AMERICA and | : | Case No. 20-10343-LSS |
| DELAWARE BSA LLC, | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |
| J.D., *et al.,* | : | Civ. No. 24-213-RGA |
| | : | (lead) |
| Appellants, | : | Civ. No. 24-265-RGA |
| v. | : | Civ. No. 24-287-RGA |
| | : | (consolidated) |
| The Honorable Barbara J. Houser (Ret.), in her capacity | : | |
| as Trustee of the BSA Settlement Trust, | : | |
| | : | |
| Appellee. | : | |

---

### OPINION

Katherine L. Hemming, Campbell & Levine, LLC, Wilmington, DE; Joel M. Walker, NYE, Stirling, Hale, Miller, & Sweet LLP, Pittsburgh, PA, attorneys for appellant J.D.

Charles J. Brown, III, Gellert Seitz Busenkell & Brown LLC, Wilmington, DE; Tyler H. Fox, Gellert Seitz Busenkell & Brown LLC, Cambridge, MA, attorneys for appellant D.S.

David T. Crumplar, Jacobs & Crumplar, P.A., New Castle, DE;  Jennifer Bogan, Babin Law, LLC, Columbus, OH, attorneys for appellants J.H. and K.S.

Kami E. Quinn, Emily P. Grim, Michael B. Rush, Chelsea A. Zrzaczek, Gilbert LLP, Washington, DC; Anthony M. Saccullo, Mark T. Hurford, Thomas H. Kovach, Mary E. Augustine, A.M. Saccullo Legal, LLC, Bear, DE, attorneys for appellee the Honorable Barbara J. Houser (Ret.), in her capacity as Trustee of the BSA Settlement Trust

March 25, 2025

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

These appeals arise in the chapter 11 cases of Boy Scouts of America and Delaware BSA

LLC (together, the "Debtors"). Appellants are four holders of Direct Abuse Claims, that is, four

individuals with claims that they are survivors of abuse suffered as a consequence of participation

in scouting. In brief, they each checked a box electing to take an expedited $3500 payout rather

than participating in more demanding proceedings that might have led to a much greater payout.

They stated, without contradiction, that they did not intend to check that box. In the Bankruptcy

Court, they sought to change the elections. The Bankruptcy Court denied their requests. *See*

Bankr. D.I. 11798[1] (denying motion of J.D.), Bankr. D.I. 11790 (denying motion of D.S.), and

Bankr. D.I. 11797 (denying motion of K.S. and J.H.) (together, the "Orders"). The Bankruptcy

Court's principal holding was that the requested relief would modify the confirmed reorganization

plan, and Appellants could not request such relief.

The appeals were consolidated,[2] and the merits of the appeals are fully briefed. (D.I. 14,

16, 18, 22, 26, 27, 29.) No party requested oral argument. For the reasons set forth below, the

Orders are affirmed.

## I. BACKGROUND

The Bankruptcy Court accurately and clearly described the factual and procedural

background for the legal issues it faced, which essentially are renewed on appeal. I do not think I

could improve upon the Bankruptcy Court's description, so I quote it at length (and without its

---

[1] The docket of the chapter 11 cases, captioned *In re Boy Scouts of America*, No. 20-10343 (LSS) (Bankr. D. Del.), is cited herein as "Bankr. D.I. __." The appendix (D.I. 17) filed in support of appellant J.D.'s opening brief is cited herein as "APP__," and the appendix (D.I. 23) filed in support of the Trustee's answering brief is cited herein as "Trustee APP__."

[2] Hereinafter, "D.I." cites to the docket of the consolidated appeal, Civ. No. 24-213-RGA.

headings and footnotes).

The Plan confirmed in the Boy Scouts of America bankruptcy case channeled all abuse claims to a Settlement Trust for liquidation and payment. The Plan and the Trust Distribution Procedures ("TDP") provide holders of Direct Abuse Claims three options for liquidation and payment: (i) an Expedited Distribution of $3,500, (ii) the Independent Review Option or (iii) the general review process capped by the maximum values in the Claims Matrix. A holder of a Direct Abuse Claim selected the Expedited Distribution option by checking a box on his ballot.

The Motions seek relief with respect to the Expedited Distribution option. Each Motion was filed by or on behalf of a holder of a Direct Abuse Claim who checked the box on his respective ballot electing to receive the Expedited Distribution. Based on a variety of legal theories (or sometimes no legal theory at all), each claimant seeks to change/rescind or revoke his respective Expedited Distribution election in order to participate in one of the other two options. Because I have determined that to grant this request would constitute an amendment to the Plan, the Motions must be denied.

On September 30, 2021, after a multi-day hearing and numerous amendments to Plan-related documents, the Solicitation Order was entered. The Solicitation Order approved voting and tabulation procedures, forms of ballots and the package of solicitation materials to be mailed to claimants. The solicitation package included the Confirmation Hearing Notice, the Disclosure Statement with all exhibits, the Plan and, where appropriate, a ballot. The Solicitation Order set a voting deadline of December 14, 2021, which was ultimately extended to March 4, 2022 for holders of Abuse Claims.

Holders of Direct Abuse Claims were solicited as Class 8 creditors either directly or through their counsel, at the holder's election. Accordingly, two forms of Class 8 ballots were approved—a Ballot for Class 8 (Direct Abuse Claims) and a Class 8 Direct Abuse Claim Master Ballot. The front page of the Ballot for Class 8 (Direct Abuse Claim) ("Ballot") informed holders that there were four items to be completed on the Ballot:

**1. VOTE TO ACCEPT OR REJECT THE PLAN**

**2. DECIDE WHETHER TO MAKE THE OPTIONAL $3,500 EXPEDITED DISTRIBUTION ELECTION**

**3. DECIDE WHETHER TO OPT OUT OF THE THIRD PARTY RELEASE**

**4. SIGN YOUR BALLOT**

The front page also cautioned claimants to read the instructions carefully before filling out the Ballot. Page 3 of the Ballot is largely devoted to a description of the Expedited Distribution election.

The Expedited Distribution election itself appears on page 6 of the Ballot as Item 3:

3

**Item 3. Expedited Distribution Election.**

Please note that if you make the Expedited Distribution election set forth in Item 3, you must still complete the remaining Items on the Ballot.

**If the Plan is confirmed as set forth above and in the Plan, the holder of an eligible Direct Abuse Claim ELECTS to:**

> **Receive the Expedited Distribution of a one-time Cash payment from the Settlement Trust in the amount of $3,500.00 conditioned upon satisfaction of the criteria set forth in the Trust Distribution Procedures, in exchange for a full and final release in favor of the Settlement Trust, the Protected Parties, and the Chartered Organizations.**

By signing the Ballot, the claimant acknowledges that he has received a copy of the Disclosure Statement and Plan and that, among other things, he "understands and, if accepting the Plan, agrees with the treatment provided for [his] Claims under the Plan."

The Ballot did not create the classes of claims or the Expedited Distribution option. Rather, the Expedited Distribution election on the Ballot implemented the Plan. The Plan establishes Class 8 as an impaired class and provides that liability for those claims is assumed by the Settlement Trust and "processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents." The Plan also provides that holders of Class 8 claims may elect to receive the Expedited Distribution, which is defined in the Plan as "a one-time Cash payment from the Settlement Trust of $3,500.00, conditioned upon satisfaction of the criteria set forth in the Trust Distribution Procedures." The Plan further provides that the election is made on the Ballot.

The Expedited Distribution is detailed in Article VI of the TDP. The TDP provides that the claimant must elect the Expedited Distribution in accordance with the Plan and sets out the criteria and minimal documentation that must be submitted to obtain the $3,500 payment. The following two sentences succinctly summarize the effect of the election:

> *A Direct Abuse Claimant who does not make the Expedited Distribution Election* and a Future Abuse Claimant who does not elect to receive the Expedited Distribution in accordance with the deadlines and procedures established by the Settlement Trust *may not later elect to receive the Expedited Distribution, A Direct Abuse Claimant who makes the Expedited Distribution Election* (or Future Abuse Claimant who elects to receive the Expedited Distribution) *shall have no other remedies with respect to any Direct Abuse Claim* he or she has against the Settlement Trust, Protected Parties, Chartered Organizations, or any Non-Settling Insurance Company.

The TDP also specifically provides that a Direct Abuse Claimant who makes the Expedited Distribution election is "not eligible to receive any further distribution" on account of his Direct Abuse Claim. In contrast, "[e]ach Abuse Claimant that does not make

4

the Expedited Distribution Election may instead elect" to (i) pursue recovery from the Settlement Trust pursuant to the TDP or (ii) pursue the Independent Review Option.

The solicitation proceeded per the Solicitation Order, as amended. Seven thousand three hundred eighty-one (7,381) holders of Class 8 claims elected the Expedited Distribution on their Ballots. Of those, 6729 claimants voted to accept the Plan, 585 claimants voted to reject the Plan and 70 claimants did not vote to either accept or reject the Plan.

On September 8, 2022, after a month-long contested confirmation hearing as well as certain supplemental proceedings, the Confirmation Order was entered. The Confirmation Order was affirmed by the District Court and is currently on appeal to the Third Circuit Court of Appeals. The District Court order has not been stayed. On April 19, 2023, Debtors filed a Notice of Effective Date and, pursuant to the terms of the Plan, the Settlement Trust was established and the Settlement Trustee has begun her work.

The Motions were filed between October 11, 2023 and November 10, 2023—over two years after the Solicitation Order was entered, over one year after the Confirmation Order was entered and nearly six months after the Plan went effective. Movants uniformly represent that they mistakenly elected the Expedited Distribution treatment by affirmatively checking the box on the Ballot. The 238 claimants represented by AVA Law Group assert that they realized then mistakes in 2022. The remaining thirty-five (35) claimants represented by other counsel assert that they recognized their mistake (or a previous failure to correct the mistake) in the August 2023 timeframe when the Settlement Trustee opened access to a trust portal created as part of the administration of the Settlement Trust. Citing various legal theories, or none at all, each claimant seeks to be relieved from his election of the Expedited Distribution option.

The Motions were greeted with objections by the Settlement Trustee. In all, the Settlement Trustee filed four objections, which, collectively, respond to each Motion. The Settlement Trustee confirms that she denied requests by each Movant to revoke his election as she does not believe the Plan or the TDP gives her authority to permit a change of election. She also opposed the Motions on the merits arguing that the relief was not supported by applicable caselaw.

The parties organized to schedule a combined hearing on the Motions for November 20, 2023. Prior to the hearing, I was informed that the parties agreed that all of the declarations filed in support of or in opposition to the Motions would come into evidence. No live testimony or other evidence was offered at the hearing.

Argument was presented by counsel for all Movants and the Settlement Trustee. As with the pre-hearing submissions, counsels' arguments focused on the Solicitation Order, Rule 60(b) and appeals to equity. From the outset of the argument, I asked questions about the proper standard to address this situation. For example, I pressed counsel on whether Rule 60 could be the proper standard and inquired as to what general equitable powers Movants thought could serve as a basis for the relief. I also asked what

effect confirmation of the Plan had on the standard. Given my questions, I provided all parties the opportunity to make an additional submission on the legal standard. Many parties took advantage of this invitation. . . .

[Long recitation of caselaw].

This admittedly long recitation of the caselaw boils down to the following:

1. The court should look at the substance of the relief requested in a motion rather than the form.

2. If the relief requested is directly contrary to a provision of a confirmed plan, the motion should be treated as a request to modify the plan.

3. After a plan has been confirmed, only the reorganized debtor or plan proponent may ask the court to modify the plan.

4. If the relief requested amounts to a request to modify the plan, the relevant standard is § 1127. Neither general equitable principles, § 105 nor Rule 60(b) can serve as a basis to obtain relief.

*In re: Boy Scouts of Am. & Delaware BSA, LLC*, 2024 WL 459571, at *1-12 (Bankr. D. Del. Feb. 5, 2024) (the "Opinion").

### C.    Appellants' Motions for Relief from Mistaken Expedited Distribution Elections

In October and November 2023—over two years after the Solicitation Procedures Order was entered, over one year after the Confirmation Order was entered, and nearly six months after the Plan went effective, Appellants and another 269 claimants filed motions to change their Expedited Distribution elections to one of the other claims resolution options, citing various legal theories. (Trustee APP01008; Trustee APP01057; APP01383.) Appellants each represented to the Bankruptcy Court that they (or a third party) mistakenly elected the Expedited Distribution treatment by affirmatively checking the box on the Ballot. (Trustee APP01008–01009; Trustee APP01058; APP01384.) The Bankruptcy Court did not address the 273 claims individually.[3] Because Appellants each argue that the Bankruptcy Court failed to consider undisputed facts

---

[3] It appears that the other claimants have not appealed.

unique to their request, the circumstances of each Appellant's mistaken election are set forth below.

### 1. Appellant J.D.

Appellant J.D. filed his Direct Abuse Claim on or about November 12, 2020. (APP1414-1415 ("J.D. Decl.") ¶ 1.) On November 27, 2021, J.D. electronically filed a Ballot for Class 8 (Direct Abuse Claims). (APP1391-1413.) On his ballot, which J.D. directly submitted without the assistance of counsel, J.D. checked a box in which he voted to accept the then current Plan offered at that time for a vote but also mistakenly checked a box in which he elected to receive the expedited distribution of a one-time cash payment from the Settlement Trust in the amount of $3,500.00. (*Id.*) Appellant submitted his ballot directly and made this mistake without his counsel's knowledge. (*See* APP1415 ¶¶ 2, 5.) As set forth in his opening brief, J.D. did not intend to elect to receive the expedited distribution of $3,500 as his only payment (D.I. 16 at 10); rather, J.D. and his counsel specifically discussed the fact that his claim had an expected high value, and J.D.'s counsel never advised Appellant to elect the Expedited Distribution, nor would he ever have done so given the high value of Appellant's claim. (*See* APP1415; APP1416-18 ("Hale Decl.").)

As further set forth in the opening brief, J.D. acted as promptly as possible to remedy the Expedited Distribution election error once it was discovered. The portal showing J.D.'s election opened on August 17, 2023. Due to technical difficulties with gaining access to the portal, J.D. asserts that J.D.'s counsel was unable to access the Trust's portal successfully until early September 2023. (APP1417, Hale Decl. ¶ 6.) J.D.'s counsel contacted the Settlement Trust in an effort to determine if a mistaken ballot had been submitted. After six weeks of inquiry to the Trust, J.D.'s counsel received a copy of the ballot submitted by J.D., which confirmed the mistaken election. (*Id.*) After receiving a copy of the ballot, Appellant's counsel confirmed with Appellant that he did not recall checking the box to make the expedited payment election and that

7

if he had done so, it was a mistake, and he never would have accepted such a small sum. (APP1417, Hale Decl. ¶ 8; *see also* APP1415, J.D. Decl. ¶ 4.)

On November 1, 2023, J.D. filed his motion seeking relief to allow J.D. to: (a) rescind or retract the election of the $3,500 Expedited Distribution, and (b) pursue his claim through the Trust Matrix Review or the Independent Review Option contemplated by the Plan and the Plan's Trust Distribution Procedures. (*See* APP1383-88.) Critically, J.D. asserts, his motion for relief was filed prior to the deadline to file both the expedited distribution questionnaire as well as the Trust Matrix Review and Independent Review Option claim questionnaires, which would determine eligibility and the allowed claim amount. (APP1384-85.)

J.D. argues that his claim could have had a value of $600,000 to $2,700,000, or maybe even more. (D.I. 16 at 5.)

### 2. Appellant D.S.

Appellant D.S. filed a Direct Abuse Claim on November 16, 2020. (Trustee APP01008 ¶ 2.) On or about December of 2021, D.S. asserts, he checked a box to reject the Plan and sent in his Ballot. (Trustee APP01038 ("D.S. Decl.") ¶ 3.) Once the portal which allowed for the administration of the Direct Abuse Claims was open, D.S.'s personal injury counsel sought to access the portal, at which time he discovered that D.S. was classified as having made the Expedited Distribution election. (*See* Trustee APP1040-1041 ("Fox Decl.") ¶ 6.) This was shocking, D.S.'s attorney asserts, "as D.S. had never asked me about the expedited option at any time—assuming he even know there was such an option—and I had never discussed that with him as a choice." (*Id.* ¶ 7.) D.S never intended to limit his claim to $3,500.00. (Trustee APP01038, D.S. Decl. ¶ 6.) When D.S. contacted the Trustee to correct the classification of his claim, he was informed that notwithstanding the fact that he had not signed the release which was required before he could

8

receive the $3,500.00 distribution, he had made a final and irrevocable Expedited Distribution Election. (D.I. 18 at 2.)

On October 11, 2023, D.S. filed his motion seeking to correct his apparent mistake in completing the ballot and checking the box electing the $3,500.00 Expedited Distribution. (Trustee APP01008-01043). Appellant D.S. asserts that, "At the hearing before the Bankruptcy Court, it was accepted and not disputed that D.S. made a mistake in completing his Ballot and that he never intended to accept $3,500.00 in full and complete satisfaction of his sexual abuse claim believed to be worth more than a million dollars. The Bankruptcy Court accepted that as true, for the purpose of deciding the Motion." (D.I. 18 at 5 (citing D.S. Decl. and Fox Decl.).)

D.S. further asserts that a creditor cannot be deemed to have made a complete and final "Expedited Distribution Election" until the creditor fully completed the Expedited Distribution Election process by both checking the box on the ballot making him eligible to receive the $3,500.00 distribution in the first instance (or obtaining leave from the Court if he failed to check the box) and later executing a release. (*See id.* at 2-3, 11-15.) Because he never executed the release, D.S. asserts, he never completed the steps required to elect the Expedited Distribution. (*See id.*)

### 3. Appellants K.S. and J.H.[4]

Appellants K.S. and J.H. intended to elect the Matrix Process, but made initial mistaken Expedited Distribution elections on their ballots. (Bankr. D.I. 11567, ¶¶ 3, 13.) Appellants later informed their counsel that these initial elections had been a mistake. (*Id.* ¶ 4 & Ex. 2-3.) Subsequently, their counsel, Babin Law, contacted their third-party vendor, "E-Ballot, to cancel both [Appellants'] votes," and "E-Ballot confirmed that both [Appellants'] ballots had been

---

[4] Given my jurisdictional ruling, this section about K.S. and J.H. is included merely for informational purposes.

canceled." (*Id.* ¶ 5 & Ex. 3.)  Subsequently, one Appellant submitted a new ballot to E-Ballot that did not elect the Expedited Distribution, and the other Appellant did not submit a new ballot, electing instead to proceed to the Claims Matrix distribution process by default. (*Id.* ¶ 7.)  E-Ballot sent Babin Law a bulk file of votes by 900 clients, but the file did not contain accurate voting records for Appellants. (*Id.* ¶ 8.)

Appellants assert that, "the evidence was undisputed that Appellants [K.S. & J.H.] did timely cancel the mistaken ballots.  The cancelled ballots were inadvertently submitted to the Trustee because of human error; namely a 'breakdown in communication at the voting entity.'" (D.I. 14 at 3 of 7.)  Appellants contend that the third party vendor engaged by Babin Law failed in its administrative and record keeping duties, resulting in faulty ballot elections to be conveyed to the Soliciting Agent. (*Id.* at 2 of 7.)  Appellants contend that their "operative" ballots were based on invalidated votes, which were contrary to their intentions, through no fault of their own. (*Id.*)

### D.    The Opinion and Order

After oral argument and supplemental briefing, on February 5, 2024, the Bankruptcy Court denied the motions to change claim elections, concluding that the Plan is unambiguous as to the Expedited Distribution election and treatment. *See In re Boy Scouts of Am.*, 2024 WL 459571, at *15-*17.  It held that the Plan provides that holders of Direct Abuse Claims must choose whether to elect an Expedited Distribution on their ballot, and that claimants who make the election are entitled to a one-time payment of $3,500 (subject to the requirements of the TDP), and nothing else. *See id.* at *15.  It further held that there is no procedural mechanism in the Plan for a claimant to change this treatment, regardless of whether he made a mistake. *See id.*  Even if the Plan could be deemed silent or ambiguous as to the revocability of Expedited Distribution elections, the Bankruptcy Court declined to fill any purported "gap" in the Plan as to this issue. *See id.* at *16-17.

The Bankruptcy Court further held that section 1127 of the Bankruptcy Code prohibits claimants from changing their treatment election. *See id.* at *9, *18. Among other things, section 1127 provides that only a plan proponent or the reorganized debtor may modify a plan post-confirmation. 11 U.S.C. § 1127(b). "The Plan provides that holders of Direct Abuse Claims who made the Expedited Distribution election on their Ballots are entitled to receive a one-time payment of $3,500 and nothing else." *In re Boy Scouts of Am.*, 2024 WL 459571, at *12. "Claimants each affirmatively checked the box electing Expedited Distribution and so, under the Plan, are treated as receiving the Expedited Distribution." *Id.* Their requests to change their respective Expedited Distribution election conflicts with the Plan and would constitute an improper modification. *See id.*

The Bankruptcy Court rejected Appellants' arguments that it could permit the claimants to change their election pursuant to its equitable powers under section 105(a) of the Bankruptcy Code or Federal Rule of Civil Procedure 60(b), as the law prohibits a bankruptcy court from exercising equitable powers that would contravene the Bankruptcy Code. *See id.* at *17-*19.

## II.    JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction to hear an appeal from a final order of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1). The Orders denying the Appellants' motions for relief from their Expedited Distribution election are each final orders. *See In re Taylor*, 913 F.2d 102, 104 (3d Cir. 1990) (holding an order is final and immediately appealable if it "fully and finally resolved a discrete set of issues, leaving no related issues for later determination").

No party has challenged whether the appeals are timely. Because "the prescribed timeline within which an appeal from a bankruptcy court must be filed is mandatory and jurisdictional," courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *In re Caterbone,* 640 F.3d 108, 110-11 (3d

Cir. 2011).

On February 5, 2024, the Bankruptcy Court entered each of the individual Orders which have been appealed, along with the accompanying Opinion. (*See* Bankr. D.I. 11798 (denying motion of J.D.), Bankr. D.I. 11790 (denying motion of D.S.), and Bankr. D.I. 11797 (denying motion of K.S. and J.H.) (together, the "Orders")). Under Bankruptcy Rule 8002, each "notice of appeal must be filed ... within 14 days after the *judgment, order, or decree* to be appealed is entered." Fed. R. Bankr. P. 8002(a)(1) (emphasis added).

J.D. filed his timely "Notice of Appeal" on February 16, 2024. (Bankr. D.I. 11829). J.D.'s notice of appeal stated that he was appealing from the order at D.I. 11798 and the accompanying opinion at D.I. 11789. D.S. filed his timely "Notice of Appeal" on February 19, 2024. (Bankr. D.I. 11833). D.S.'s notice of appeal stated that he was appealing from the order at D.I. 11790 and the accompanying opinion at D.I. 11789.

The docket of the chapter 11 cases reflects that "Appellants listed as: K.S., J.H., and D.S." filed a "Notice of Appeal" on March 1, 2024 (Bankr. D.I. 11865), outside of the 14-day deadline for K.S. and J.H. to appeal. The actual notice of appeal, however, only has two appellants: "J.H. and K.S." It states that it is an appeal from the order at D.I. 11797 and the accompanying opinion at D.I. 11789. After stating the date of the order appealed from—February 5, 2024—it states, "Claimant J.D. filed a Notice of Appeal on February 16, 2024."[5]

J.H. and K.S. were the first parties to appeal from the order at D.I. 11797. It was not within the 14-day deadline. Thus, the appeals of J.H. and K.S. are untimely unless they are able to take advantage of either J.D.'s or D.S.'s timely appeals from other orders.

---

[5] There is an amended notice of appeal by J.H. and K.S. (Bankr. D.I. 11869, docketed March 4, 2024). The amended notice of appeal does not appear to have any different information in it than the earlier notice of appeal.

K.S. and J.H. would have to rely on Federal Rule of Bankruptcy Procedure 8002(a)(3), which addresses "multiple appeals" and provides that, "If one party timely files a notice of appeal, *any other party* may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise allowed by this rule—whichever is later." Fed. R. Bankr. 8002(a)(3) (emphasis added); *see also* 10 Collier on Bankruptcy ¶ 8002.06 (16th ed. 2024) ("The purpose of this provision, making possible additional time for an appeal that is taken after an initial appeal, is simply to permit *each party to a judgment, order, or decree* to decide, insofar as it is possible, upon the advisability of an appeal with full knowledge of the intentions of at least one of the other parties with respect to an appeal.") (emphasis added.)

Although the Notice of Appeal for K.S. and J.H. cites the Opinion, the Opinion is not a "judgment, order, or decree." It is what it purports to be, an explanation for an order. It is unclear how K.S. and J.H. can rely on Bankruptcy Rule 8002(a)(3) to extend the 14-day deadline for their appeal where J.D. and D.S. each appealed an entirely separate "judgment, order, or decree."

The Court has not located a case with identical facts, but the Third Circuit, in a non-precedential opinion, indicated that application of the "multiple appeal" rule turns on standing. *See In re U Lock Inc.*, 2025 WL 80261, at *2 (3d Cir. Jan. 13, 2025). For example, in *In re U Lock Inc.*, U Lock appealed an order more than fourteen days after entry of the Bankruptcy Court's order and sought to have it considered timely based on the timely appeal of another participant in the proceedings, Snyder. *Id.* The Third Circuit explained that U Lock's appeal was "untimely when considered on its own, but may be rendered timely if Snyder's appeal from the case's dismissal [i.e., from the same order that U Lock had appealed] constitutes the appeal of a 'party' under Bankruptcy Rule 8002(a)(3). *Id.* "Whether Snyder is a 'party' whose appeal renders U Lock's appeal timely turns on whether she had standing to appeal." *Id.* (citing *Maiz v. Virani*, 311 F.3d 334, 339 (5th Cir. 2002) (explaining that if a party has standing to appeal, it qualifies as a

13

party for purposes of the "multiple appeal" rule in Federal Rule of Appellate Procedure 4(a)(3), on which Bankruptcy Rule 8002(a)(3) is based)). Given that Snyder lacked standing to appeal the Bankruptcy Court order, "her appeal was not one by a 'party' under Bankruptcy Rule 8002(a)(3) whose appeal could extend the time for U Lock to appeal." *Id.* at *3. The District Court therefore lacked jurisdiction to have considered U Lock's appeal.

Unlike in *U Lock*, neither J.D. nor D.S. purported to appeal from the order which K.S. and J.H. later appealed. Thus, literally, K.S. and J.H. have no basis for relying on the appeals of J.D. and D.S. This outcome would be consistent with the reasoning in *U Lock*. Neither J.D. nor D.S. is a "party" whose appeal would render K.S. and J.H.'s appeal timely. Neither J.D. nor D.S. had standing to appeal the "judgment, order, or decree" that K.S. and J.H. seek to appeal. "The Third Circuit has held that only a 'person aggrieved' by an order of the Bankruptcy Court has standing to appeal that order." *In re New Century TRS Holding, Inc.,* 612 F. App'x 147, 149 n.6 (3d Cir. 2015) (quoting *Gen. Motors Acceptance Corp. v. Dykes,* 10 F.3d 184, 188 (3d Cir. 1993)). The "person aggrieved" rule states that only those whose pecuniary interests are directly and adversely affected by a Bankruptcy Court order that "diminishes their property, increases their burdens, or impairs their rights" may appeal. *Id.* (quoting *Travelers Ins. Co. v. H.K. Porter Co.,* 45 F.3d 737, 741-42 (3d Cir. 1995)). While J.D. and D.S. (like K.S. and J.H.) dispute the reasoning in the underlying Opinion, neither J.D. nor D.S. is a person aggrieved by the individual order denying K.S. and J.H.'s motion. The order denying K.S. and J.H.'s motion did not diminish J.D. and D.S.'s property, increase their burdens, or impair their rights. As J.D. and D.S. would have lacked standing to appeal the order denying K.S. and J.H. relief, K.S. and J.H. cannot rely on J.D.'s and D.S.'s timely appeals to extend their deadline under Bankruptcy Rule 8002(a)(3). While this result may seem harsh, the timeliness of K.S. and J.H.'s appeal is mandatory and jurisdictional and

14

cannot be waived. *In re Caterbone*, 640 F.3d at 111. Since I do not think I have jurisdiction over the appeals of K.S. and J.H., I will dismiss their appeals.[6]

This Court "review[s] the bankruptcy court's legal determinations *de novo,* its factual findings for clear error and its exercise of discretion for abuse thereof." *See In re Trans World Airlines, Inc.*, 145 F.3d 124, 130 (3d Cir. 1998). If necessary, the court "must break down mixed questions of law and fact, applying the appropriate standard to each component." *Meridian Bank v. Alten*, 958 F.2d 1226, 1229 (3d Cir. 1992) (quoting *In re Sharon Steel Corp.*, 871 F.2d 1217, 1222 (3d Cir. 1989)).

The Court reviews "grants or denials of relief under Rule 60(b), aside from those raised under Rule 60(b)(4), under an abuse of discretion standard." *Budget Blinds, Inc. v. White*, 536 F.3d 244, 251 (3d Cir. 2008) (internal footnote omitted) (citing *Harris v. Martin*, 834 F.2d 361, 364 (3d Cir. 1987)). "An abuse of discretion exists where the [bankruptcy] court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact. *Goodwin v. Carickhoff (In re Decade, S.A.C., LLC)*, 2020 WL 564903, at *4 (D. Del. Feb. 5, 2020) (quoting *In re In re Marvel Ent'mt Grp.*, 140 F.3d 463, 470 (3d Cir. 1998)). A finding of fact is clearly erroneous "only if it is completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data." *Advance Cap. Partners, LLC v. Rossmann,* 495 Fed. Appx. 235, 237 (3d Cir. 2012).

## III.    ANALYSIS

### A.    The Plan Unambiguously Prohibits Claimants from Changing their Expedited Distribution Elections

A plan of reorganization is governed by principles of contract interpretation. *In re NorthEast Gas Generation, LLC*, 639 B.R. 914, 923 (Bankr. D. Del. 2022). The Confirmation

---

[6] I note that on the merits, K.S. and J.H. are no differently placed than J.D. and D.S.

Order and the Plan provide that Delaware law governs situations, such as here, where neither the

Bankruptcy Code nor other federal law is applicable.  (APP00462; APP00500; APP00876;

APP01550.)  Delaware courts construe contracts to give effect to the intent of the parties.

*Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023).  Under Delaware law, absent an

ambiguity in the contract, the contract is enforced pursuant to its terms.  *Allied Capital Corp. v.

GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).  Courts should not twist

unequivocal language in the guise of interpreting a contract.  *Id.*  A contract is ambiguous when

the contested language is "susceptible to more than one reasonable interpretation." *Weinberg*, 294

A.3d at 1044 (quoting *Manti Holdings, LLC v. Authentix Acquisition Co.*, 261 A.3d 1199, 1208

(Del. 2021)).  "[A]n interpretation is unreasonable if it produces an absurd result or a result that no

reasonable person would have accepted when entering the contract." *Id.* (quoting *Manti Holdings*,

261 A.3d at 1208 (internal citations omitted)).  Disagreement over interpretation does not render

terms ambiguous.  *Id.* (citing *Manti Holdings*, 261 A.3d at 1208).

The Plan provides that holders of Direct Abuse Claims who made the Expedited

Distribution election on their ballots are entitled to receive a one-time payment of $3,500 (subject

to the requirements of the TDP) and nothing else.[7]  There is no provision of the Plan that permits

claimants to later change this election—due to mistake or any other reason.  Appellants point to no

language in the Plan or TDP pertaining to the election or treatment of Direct Abuse Claims that

reasonably can be interpreted differently.  Nor does this reading yield an absurd result—as the

---

[7] *See* APP00474 ("A Direct Abuse Claimant who makes the Expedited Distribution
Election . . . shall have no other remedies with respect to any Direct Abuse Claim he or she has
against the Settlement Trust, Protected Parties, Chartered Organizations, or any Non-Settling
Insurance Company. Direct Abuse Claimants that make the Expedited Distribution Election . . .
will not be eligible to receive any further distribution on account of their Direct Abuse Claim
pursuant to these TDP.")

Bankruptcy Court noted, "there is nothing absurd about the finality of an election to join a convenience class."[8] *In re Boy Scouts of Am.*, 2024 WL 459571, at *15.

Because the Plan does not state expressly that revocation of an Expedited Distribution election is prohibited, Appellants assert that the Plan is ambiguous. (*See* D.I. 18 at 11; D.I. 16 at 32-34.) According to Appellants, the alleged "silence" on the issue of finality is a "gap" that the Bankruptcy Court must fill by writing new terms into the Plan regarding revocation. (*See* D.I. 18 at 16; D.I. 16 at 32-34.)

A court determines if there is a gap in contract language through contract construction in the context of an implied covenant. *In re El Paso Pipeline Partners, L.P. Derivative Litig., C.A.*, 2014 WL 2768782, at *17 (Del. Ch. June 12, 2014); *Reklam v. Bellator Sport Worldwide LLC*, 2017 WL 5172397, at *5 (D. Del. Nov. 8, 2017). Courts first determine whether there is "true silence" on the subject, and, if so, then determine "whether the implied covenant should be used to supply a term to fill the gap." *El Paso*, 2014 WL 2768782, at *17. The Bankruptcy Court determined that the Plan does not meet either of these two prongs. *See In re Boy Scouts of Am.*, 2024 WL 459571, at *15-*17.

I agree. As an initial matter, I agree that the Plan is not "truly silent" on the subject of revocability. *See id.* at *15. Neither the Plan nor the TDP speaks in provisional terms; rather, holders of Direct Abuse Claims were given a choice, and the Plan does not provide that holders can change their election once made. *Id.* If silence equates to revocability, all holders of Direct Abuse Claims who elected the Expedited Distribution could change their mind at any time, with seemingly no deadline to do so.

---

[8] "Convenience class" refers to Section 1122 of the Bankruptcy Code, which permits a plan proponent to create an administrative convenience class of unsecured claims, namely, a single class of all unsecured claims that are less than, or reduced to, a certain claim amount. 7 Collier on Bankruptcy ¶ 1122.01 (16th ed. 2025).

Even if one could read the Plan as ambiguous and silent on this issue, the Bankruptcy Court correctly declined to write new terms into the Plan to fill any purported "gap." *See id.* at *17. Delaware courts are clear that "[n]ot all gaps should be filled." *El Paso*, 2014 WL 2768782, at *17. Filling a gap is only an "occasional necessity ... to ensure that parties' reasonable expectations are fulfilled," and the Delaware Supreme Court has "admonish[ed] against a free-wheeling approach to the implied covenant." *Id.* at *18 (citation omitted); *see also Oxbow Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) ("[T]he 'covenant is a limited and extraordinary legal remedy.'" (citation omitted)). If the court determines the gap should be filled, the court can only supply "those terms that the parties would have agreed to . . . if they had thought to address them." *El Paso*, 2014 WL 2768782, at *18 (quoting *Gerber v. Enter. Prods. Holding, LLC*, 67 A.3d 400, 418 (Del. 2013) (overruled on other grounds)). "Terms are to be implied in a contract not because they are reasonable but because they are necessarily involved in the contractual relationship so that the parties must have intended them and have only failed to express them because they are too obvious to need expression." *Id.* (quoting *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 1997 WL 525873, at *5 (Del. Ch. Aug. 13, 1997), *aff'd* 708 A.2d 989 (Del. 1998)). A court does not supply terms as an equitable remedy for events that "could have been anticipated, but were not, that later adversely affected one party." *Oxbow Carbon*, 202 A.3d at 507 (citation omitted). The court interpreting the agreement "cannot use an implied covenant to re-write the agreement between the parties, and 'should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.'" *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 897 (Del. 2015) (quoting *Allied Capital*, 910 A.2d at 1035).

To show that there is a "gap" and that the Expedited Distribution election as intended to be revocable, Appellants cite that the negotiating parties' discussion of the Expedited Distribution at

the Disclosure Statement hearing. (*See* D.I. 18 at 16-17; D.I. 16 at 32-34.) The record reflects that

the TDP, as well as the Ballot, were a significant topic of the Disclosure Statement hearing. As

the Bankruptcy Court noted in the Opinion, "[a]fter a robust discussion, I concluded that the

Expedited Distribution election would be made on the Ballot, not after the Effective Date as part

of the trust administration process, to ensure that at the confirmation hearing the court and parties

had information relevant to the Debtors' request for third party releases." *In re Boy Scouts of Am.*,

2024 WL 459571 at *17 & n.103. "Subsequently, the negotiating parties discussed on the record

the potential inclusion of an opt-out option for claimants who elected Expedited Distribution on

their Ballot." *Id.* & n.104. The Bankruptcy Court stated that Debtors could incorporate

optionality in their plan if they so chose, stating, "If that's the plan that people want to put in front

of me, that's fine." *Id.* & n.105 (citing Bankr. D.I. 6437 (9/29/2021 Tr.) at 102:14-103:1).

The parties did not put such a plan in front of the Bankruptcy Court. Following the

Disclosure Statement hearing, the Plan and TDP were amended solely to restrict the ability to

modify the Plan to permit claimants to later make an Expedited Distribution election without court

approval. *See id.* Similarly, the amended Solicitation Procedures that the Debtors filed following

the hearing did not contain any indication that a claimant could change his election. To the

contrary, the new version of the Proposed Solicitation Procedures Order *added* language stating,

"If selecting the $3,500 Expedited Distribution, you must indicate this on the Ballot. A holder of a

Direct Abuse Claim will not be able to choose this option at a later date unless the Bankruptcy

Court approves otherwise." (*See* Trustee APP00419-01007, Ex. B, § IV.D (redline showing this

change).) As the Bankruptcy Court concluded, multiple sophisticated parties thoroughly

negotiated and vetted the Plan's treatment of Direct Abuse Claims. *In re Boy Scouts of Am.*, 2024

WL 459571 at *17. The parties could have, but did not, include the concept of revocability in the

Plan's treatment of Expedited Distribution claimants. Holders of Direct Abuse Claims could have

19

(and did) raise issues regarding treatment in disclosure statement or confirmation objections. *Id.* None raised this particular issue. *Id.* Accordingly, even assuming that a "gap" existed with respect to this issue, the Bankruptcy Court correctly concluded that it should not be filled. *Id.*

In sum, I agree that the Plan unambiguously prohibits claimants from changing their Expedited Distribution Election.

### B.    The Motions to Change Claim Elections Seek an Impermissible Amendment to the Plan

Under well accepted law, a confirmed plan binds all parties in interest and may only be modified by the plan proponents or reorganized debtor. *See* 11 U.S.C. §§ 1127(b), 1141(a); *Kravitz v. Samson Energy Co., LLC (In re Samson Res. Corp.)*, 590 B.R. 643, 649 (Bankr. D. Del. 2018); *In re Vencor, Inc.*, 284 B.R. 79, 85 (Bankr. D. Del. 2002). Neither the plan proponents nor the reorganized debtor have sought such relief here, and thus, Appellants' Motions were properly denied on these grounds alone.

Even if Appellants had authority under the Bankruptcy Code to modify the Plan post-confirmation, as the Bankruptcy Court explained, the requested modifications are improper because they seek to change a treatment election in a manner inconsistent with the Plan. *See In re Boy Scouts of Am.*, 2024 WL 459571 at *8-*9 (canvassing applicable case law).

For example, in a case cited by the Bankruptcy Court, *In re Allied Supermarkets*, 21 B.R. 45 (Bankr. E.D. Mich. 1982), Bear, Stearns elected to receive cash and stock for one group of beneficial holders, but failed to make an election for a second group of holders. *Id.* at 46. Bear, Stearns moved to file a tardy election, claiming that it was a "procedural modification of the Plan not substantially affecting the rights of other creditors concerned with the Plan." *Id.* at 47. The court held that Bear, Stearns' failure to return the election form was an election in accordance with the plan, as the plan clearly stated that, "Creditors who do not complete the election portion of the

accompanying form and return it to the Debtors prior to confirmation of the Plan will be deemed

to have elected to receive solely a cash payment in accordance with the Plan." *Id.* Thus the

"motion by Bear, Stearns is an attempt to modify the Plan by revoking its earlier election." *Id.*

*In re Centennial Healthcare Corp.,* 2004 WL 5848015 (Bankr. N.D. Ga. Mar. 19, 2004),

reached a similar result. Id. at *3. During a bankruptcy that provided claimants with two options

for distribution, certain claimants filed timely ballots, but failed to make a treatment election. *Id.*

at *1. A day before the voting deadline, the same claimants moved for an extension to elect a

treatment or change the ballot. *Id.* The court denied the motion stating, "[It is not the Court's

Plan; it is the Debtors' Plan. To change the terms of the Plan is to amend it, which . . . the Court

does not have the power to do." *Id.* at *3; *see also In re SC SJ Holdings, LLC v. Pillsbury*

*Winthrop Shaw Pittman LLP (In re SC SJ Holdings, LLC)*, 2023 WL 2598842, at *5 (D. Del. Mar.

22, 2023) (recognizing that a change that is "'directly contrary to the express provisions of the

[p]lan' constitutes a modification within the meaning of § 1127(b)" (quoting *In re Daewoo Motor*

*Am., Inc.*, 488 B.R. 418, 425-26 (C.D. Cal. 2011)) (alteration in original)), *aff'd*, 2024 WL

1328233 (3d Cir. Mar. 28, 2024)

While Appellants note certain differences between the above-referenced cases and this

case (*see* D.I. 18 at 18–22; D.I. 16 at 14–22), they do not contest the fundamental underpinnings

of the Bankruptcy Court's decision—that the Plan dictates the Appellants' treatment, and that the

Bankruptcy Code prohibits them from modifying the Plan. Rather, Appellants argue that changing

their election is not a modification of the Plan, either because (1) the Plan already permits them to

change their election, (2) they have not yet made their treatment election because they have not

executed a release (as argued by Appellant D.S.), or (3) they are merely asking the Court to correct

a "record keeping error" regarding their intended treatment election (as argued by Appellants J.H. and K.S.).[9] The Bankruptcy Court rejected all three arguments.

I agree that Appellants D.S. and J.D.'s argument—that their motions required no Plan modification because the Plan already permits them to change their election—fails for the reasons set forth above. The requests by Appellant are requests to modify the Plan because to grant relief would create a remedy that the Plan prohibits—i.e., permitting an Expedited Distribution claimant to receive more than a one-time $3,500 payment. Regardless of how Appellants characterize their requests, the relief they seek is inconsistent with the plain language of the Plan.

Appellant D.S.'s argument—that he is not seeking to modify the Plan because no claimant's treatment election can occur until they execute a release—also fails. I agree with the Bankruptcy Court that "the Plan provides [that] the receipt of the Expedited Distribution is subject to satisfaction of the criteria set forth in the TDP." *In re Boy Scouts of Am.,* 2024 WL 459571 at *19. Those criteria are "not part of the election, rather they are conditions to receiving the $3,500 distribution that a claimant elected (*e.g.,* submitting your signed proof of claim form and signing a release)." *Id.* D.S. has elected the $3,500 payment. If he doesn't sign the proof of claim and the release, he doesn't get a do-over; he gets nothing.

Finally, Appellants J.H. and K.S. argue that they are not seeking a remedy inconsistent with the Plan but rather are seeking a ministerial correction of the Debtors' voting records. The circumstances of Appellants J.H. and K.S.'s mistaken election differ from those of J.D. and D.S. Appellants J.H. and K.S. presented evidence that they originally made the Expedited Distribution election by mistake, timely realized the mistake and informed their counsel, but through a combination of errors, Appellants' cancelled ballots were submitted and they were reflected in

---

[9] I address the arguments raised by K.S. and J.H. because D.S. purports to have adopted the arguments of the other claimants. (D.I. 18 at 22.)

Babin Law's Master Ballot as having elected the Expedited Distribution option. Appellants argue that the evidence is undisputed that their cancelled ballots were inadvertently submitted to the Trustee because of human error; namely a "breakdown in communication at the voting entity." (D.I. 14 at 3 of 7 (quoting *In re Imerys Talc Am.*, 2021 WL 4786093, at *7 (Bankr. D. Del. Oct. 13, 2021)).) In *In re Imerys*, the court considered motions for relief under Bankruptcy Rule 3018, which provides that, "[f]or cause shown, the court ... may permit a creditor or equity security holder to change or withdraw an acceptance or rejection" of a plan. Fed. R. Bankr. P. 3018. There, the court observed that, "Neither the Bankruptcy Rules nor the Bankruptcy Code define cause. It is up to judges to determine 'cause' based on the context and to grant or deny a motion in their discretion." *In re Imerys Talc Am.*, 2021 WL 4786093, at *7. In considering what might meet the "for cause" standard, the Bankruptcy Court noted that "human error is 'cause' to change a vote. Human error occurs when there is (i) a breakdown in communications at the voting entity; (ii) a misreading of the plan terms; or (iii) the execution of a ballot by one without authority corrected by one with authority." *Imerys Talc Am.*, 2021 WL 4786093, at *7 (citing *In re MPM Silicones, LLC*, 2014 WL 4637175 (Bankr. S.D.N.Y. Sep. 17, 2014)).

As Appellant's motions do not seek to change or withdraw an acceptance or rejection of the Plan under Bankruptcy Rule 3018, the "for cause" discussion in *In re Imerys* is not relevant here. As the Bankruptcy Court correctly explained, the election of the Expedited Distribution option is wholly separate from the vote on the Plan. "Rule 3018 says nothing about changing this wholly separate decision. And, again, a rule of procedure cannot supercede the requirements of a statute." *In re Boy Scouts of Am.*, 2024 WL 459571 at *19.

As the Bankruptcy Court correctly noted, the reason for the purported mistake, or the identity of the person making the mistake, is irrelevant, as the Plan does not permit claimants to change an Expedited Distribution election for any reason. While Appellants J.H. and K.S.

provided undisputed evidence of their timely attempts to correct their mistaken Expedited

Distribution elections, ultimately their votes were recorded correctly based on the ballots received

by the soliciting agent, Omni Agent Solutions. (Trustee APP01087.) Appellants J.H. and K.S.

cite no authority to support their contention that a third-party mistake is relevant to the inquiry.

Because the Plan is unambiguous with respect to the treatment and election of an

Expedited Distribution, Appellants' request to change their election constitutes an impermissible

attempt to modify the Plan.

C.    **Section 105 of the Bankruptcy Code and Federal Rule of Civil Procedure 60(b)**

Appellant J.D. argues that, if there were ever a case where the Bankruptcy Court should

have embraced the Third Circuit's recognition of the "broad authority" of bankruptcy courts to

provide equitable relief—and to "craft flexible remedies that, while not expressly authorized by

the Code, effect the result the Code was designed to obtain"—this would be it. (D.I. 16 at 5-6

(first quoting *In re Combustion Engineering, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004) and second

quoting *Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v.

Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (en banc)).) The Court would agree were it not for

sections of the Bankruptcy Code which expressly prohibit the relief sought.

As Appellant J.D. correctly argues, section 105(a) of the Bankruptcy Code grants

bankruptcy courts broad authority to provide equitable relief. *Combustion Eng'g Inc.*, 391 F.3d at

236; *Cybergenics*, 330 F.3d at 568. However, "whatever equitable powers remain in the

bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."

*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988). Section 1127(b) of the

Bankruptcy Code affirmatively *forbids* modification of the Plan. *See In re NorthEast Gas*, 639

B.R. at 924 (rejecting request to modify plan under § 105(a) on the basis that it would "produce a

result at odds with the specific provisions of § 1127(b)" (quoting *In re Rickel & Assocs.*, 260 B.R.

673, 678 (Bankr. S.D.N.Y. 2001)). Accordingly, the Bankruptcy Court did not err in concluding that it cannot use its equitable powers under § 105(a) to grant the Appellants' requested relief.

Nor does Federal Rule of Civil Procedure 60(b) provide an opportunity for relief. A party may only receive equitable relief under Rule 60(b) "from a final judgment, order, or proceeding for … mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b)(1) (made applicable by Federal Rule of Bankruptcy Procedure 9024). A motion seeking relief under Rule 60(b) on grounds of mistake, inadvertence, surprise, or excusable neglect must be made "no more than a year after the entry of the judgment or order or the date of the proceeding." Fed. R. Civ. P. 60(c)(1).

I find no abuse of discretion in the Bankruptcy Court's denial of relief under Rule 60(b). As a rule of procedure, Rule 60 cannot supersede a statutory requirement. *SC SJ*, 2023 WL 2598842, at *6. Accordingly, Rule 60 cannot supersede section 1127's statutory prohibition on plan modification. "As the Third Circuit has explained, a rule of procedure cannot negate the substantive impact of a restriction contained in a provision of the Bankruptcy Code or validly provide a movant with a substantive remedy that would be foreclosed by such a statutory provision." *SC SJ*, 2023 WL 2598842, at *6) (quoting *In re Fesq*, 153 F.3d 113, 116–17 (3d Cir. 1998) (cleaned up)). Appellants' requests are not timely, as they filed their motions for relief after the one-year period proscribed by Rule 60(c)(1), regardless of whether one calculates that period based on the date of entry of the Solicitation Order or the Confirmation Order.[10]  Even if section

---

[10] Appellants J.H. and K.S. further cite Rule 60(b)(6), which is a catch-all provision applicable when "any other reason [] justifies relief." (D.I. 14 at 3.) However, Appellants fail to explain why Rule 60(b)(1) and its associated one-year time limitation would not apply, since what they argue amounts to a form of mistake. As the Bankruptcy Court correctly held, Rule 60(b)(6) cannot be used to avoid the time limitations of Rule 60(b)(1). *In re Boy Scouts of Am.*, 2024 WL 459571, at *18 (citing *Kemp v. United States*, 596 U.S. 528, 533 (2022) ("[Rule 60(b)(6)] is available only when Rules 60(b)(1) through (b)(5) are inapplicable.").

1127 did not forbid modification of the Plan, and even if Appellants had filed their request within

the one-year time period proscribed by Rule 60(c)(1), Appellants did not prove mistake or

excusable neglect sufficient to obtain relief under Rule 60.  The Bankruptcy Court concluded,

based on a careful analysis of the relevant documents and the factual record, that the ballot was

sufficiently clear and that all claimants were represented by counsel.  *In re Boy Scouts of Am.,*

2024 WL 459571, at *18.   Appellants provide no evidence or argument to conclude that the

Bankruptcy Court abused its discretion in denying relief under Rule 60(b).

### D.    The Bankruptcy Court's Rejection of a General Proposition Does Not Warrant Reversal of its Legal Conclusions

In a footnote at the conclusion of the Opinion, the Bankruptcy Court observed:

> While recognizing the harsh nature of this result for these Movants,
> I do not accept the general proposition advanced by some counsel in
> argument that no holder of a Direct Abuse Claim would knowingly
> accept $3,500 in exchange for a multi-million-dollar-claim. This
> argument is directly counter to views expressed by many survivors
> during the course of the bankruptcy case who seek recognition from
> Boy Scouts of the harm they suffered while a scout, do not wish to
> be retraumatized by continued discussion of their abuse and want to
> keep their abuse private. Among other things, Expedited
> Distribution services these aims.

*In re Boy Scouts of Am.*, 2024 WL 459571 at *19 n.118).  J.D. argues that, while "there is no

contrary evidence regarding Appellant's lack of intent [to check] the wrong box," and "no

evidentiary basis for the Bankruptcy Court … to conclude Appellant's checking of the box was

anything other than a mistake," the Bankruptcy Court nevertheless "concluded without any

support that Appellant intended and would have preferred the Expedited $3,500 payment."  (D.I.

16 at 23.)  I disagree.  In this portion of the Opinion, the Bankruptcy Court merely rejected, as a

general proposition, that "no holder of a Direct Abuse Claim would knowingly accept $3,500 in

exchange for a multi-million-dollar-claim."  The Bankruptcy Court made no finding as to J.D.'s

intent or whether he made a mistake; rather, the Bankruptcy Court ruled that the reason for the

purported mistake, or the identity of the person making the mistake, asserted by any claimant is irrelevant, as the Plan does not permit claimants to change an Expedited Distribution election for any reason.

## IV.    CONCLUSION

As the Bankruptcy Court observed, "the conclusion in this matter yields a harsh result," and the circumstances are also unfortunate "as each [Appellant] had counsel to advise him in completing his ballot, ensuring and/or confirming correction of any mistaken elections and timely bringing the matter to the attention of the court prior to confirmation of the Plan." *In re Boy Scouts of Am.*, 2024 WL 459571, at * 19. However, the Court agrees that the remedy sought by Appellants was not one that the Bankruptcy Court could provide. Accordingly, the Orders will be affirmed. A separate order will be entered.